E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

July 31 2020 8:59 AM

KEVIN STOCK
COUNTY CLERK
NO: 20-2-07110-8

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF PIERCE**

BLAKE INGRAM,

        Plaintiff,

    vs.

BATES TECHNICAL COLLEGE, and LIN ZHOU,

        Defendants.

Case No.

**COMPLAINT & DEMAND FOR JURY TRIAL**

The Plaintiff,   BLAKE INGRAM by and through MATTHEW Z. CROTTY, of CROTTY & SON LAW FIRM, PLLC complains of Defendants and alleges as follows:

## I. PARTIES, JURISDICTION, & VENUE

1.     Blake Ingram was employed by the above-captioned Defendants during the time-frame relevant to this lawsuit and worked in Pierce County, Washington, on behalf of Defendants.

2.     Defendant Bates Technical College (BTC) is an agency of the State of Washington.

3.     Defendant Lin Zhou is BTC's President.

4.     The Pierce County Superior Court has jurisdiction over this case.

COMPLAINTCOMPLAINT & DEMAND FOR JURY
TRIAL - 1

5.     Venue is proper in Pierce County because, *inter alia,* Defendants conduct business in Pierce County and the acts and omissions giving rise to Mr. Ingram's Complaint took place in Pierce County, Washington.

## II. FACTS

6.     Plaintiff incorporates the above facts as if pled verbatim herein.

7.     BTC hired Mr. Ingram in 1999.

8.     BTC employed Mr. Ingram first as a Program Coordinator and later as a Program Manager, Associate Dean of Instruction, Dean of Instruction, Dean of Workforce and Community Development, and back to Dean of Instruction in 2018 and elected Chair of the College Council.

9.     Mr. Ingram's evaluations from 2009-2013, when working through BTC Student Services to manage the Worker Retraining program were consistently very high (all 4-5 on a scale of 5, and sometimes all 5). Relevant comments include:

> He provides the VP of Student Services with timely reports on the status of the Workers Retraining goals and objectives.

10.     On or about June 17, 2013, Mr. Ingram was evaluated by Supervisor Dion Teague at 4=Exceeds Requirements or above in all categories.  Comments on his evaluation included:

> Blake continues to deliver exceptional coordination and management of the College's Worker Retraining Program.  His oversight of the Worker Retraining program consistently meets our allocation and goals, resulting in additional WRT FTE allocations and retained revenue for the College.  Input from students he supports with funding have an overall rating of excellent.

11.     In 2015, when Mr. Ingram was advanced to the position of Dean, he took on a significant workload overseeing eighteen BTC programs along with major financial grants, and Veteran Services which, in turn, led to Mr. Ingram working two full time positions.

COMPLAINT - 2

12.     During the June 2018 time frame Mr. Ingram received his Exempt Employee Evaluation after completing three years as the Dean of Workforce and Community Development. BTC Executive Vice President Al Griswold signed the document which covered the period from 7/1/15 to 2/2/18. The evaluation ranked Mr. Ingram Satisfactory (3) or above in all categories evaluated, including two 5=Excellent/highest rankings for Teamwork and Communication Skills, and four 4=Exceeds Requirements rankings.

13.     Mr. Griswold's 2018 Evaluation of Mr. Ingram notably included the following comment from Mr. Ingram directly beneath Mr. Griswold's Evaluator's Signature:

> This last two year evaluation period has evidenced a strong degree of under-support by specific cabinet level leadership. Several interactions have impressed upon me that even my most successful accomplishment were undervalued, to the point of causing me to question leaderships' motivation, intrinsic biases and hidden agendas. However these behaviors are wide spread across the entire college, and culture has suffered in a variety of ways, as evidenced by the College Climate Survey results and documented patterns of misconduct.

14.     In mid-June 2018, Mr. Griswold informed Mr. Ingram that his Dean of Instruction position had been extended through June 30, 2019. To that end, Mr. Ingram would supervise the Continuing Education Department, five Career Technical Education Programs, the Opportunity Grant, and the AAI/L&I, City of Tacoma and Muckleshoot contracts. Moreover, the CCW Contract, previously managed by Mike Brandstetter and Brandon Rogers, would be assigned to Mr. Ingram effective October 1, 2018. The newly re-created Dean position (which historically experienced a high degree of turnover) was located at BTC's South Campus, requiring an office move for Ingram. That campus was directly supervised by Associate VP/Campus Dean Brandon Rodgers who would soon resign (after being told by Mr. Griswold that President Zhou intended to terminate him). It is important to note that during this transition, Mr. Ingram was not formally

COMPLAINT - 3

or informally trained or oriented to his new role and responsibilities by EVP Griswold or AVP Rogers.

15.     On July 5, 2018, during his first week in the new position, Mr. Ingram was copied on an email thread between AVP Brandon Rodgers and Director of Finance Irina Kukharenko regarding the lack of funding to sustain paid Staff Karen Dhaliwal, as part of a five-year AAI/L&I contract. That contract was only nearing the end of its third year of operation, at this point.  To that end, Mr. Ingram met with Mr. Rodgers, President Lin Zhou, and Mr. Griswold to discuss options for retaining the skilled staff member, or at least offer her a compassionate amount of notice before termination. Ms. Zhou pushed Mr. Ingram to give Ms. Dhaliwal notice immediately. Mr. Ingram argued to extend the position at least through the end of that August. The debate became quite heated, but eventually the group agreed to extend the contract.

16.     On July 21, 2018, Mr. Ingram departed campus on scheduled vacation, calendared to last until July 30th.

17.     On July 28, 2018, Mr. Ingram injured his lower back, causing pain so significant he could not walk nor sit upright without considerable pain.

18.     On July 30, 2018, Mr. Ingram called and emailed his need for sick leave to Mr. Griswold and Mr. Rodgers.

19.     On August 2, 2018, after a second visit to the doctor for imaging results, Mr. Ingram learned he had fractured one of his vertebrae completely in half, related in part to a degenerative disorder in that vertebrae.  Avoiding a major surgery, the doctor recommended Mr. Ingram take

COMPLAINT - 4

August 3-23, 2018 as approved sick leave to allow inflammation to reduce and the vertebrae to heal.

20.     During July and August 2018, Mr. Ingram had minimal contact with his supervisor, Mr. Griswold, and instead Mr. Rodgers continued with the South Campus supervisory responsibilities (as he had for the previous six months).

21.     From August 24-September 14, 2018, Mr. Ingram returned to work half-time. Again, the sick leave hours were fully approved.

22.     On August 16, 2018, while Mr. Ingram was on medical leave due to his broken vertebrae, Mr. Griswold emailed Mr. Ingram expressing concern that Mr. Ingram had included Classified Union President Shondea Chapman in the August 2018 Washington Center professional development conference, the Equity Mindset National Institute.

23.     Mr. Ingram did not see this email initially, and it is unclear why Mr. Griswold would have sent it while Ingram was on leave; however, this email shows an early indication that Griswold was unfairly targeting Mr. Ingram. The email specifically suggests retaliation due to Mr. Ingram's role in Strategic Plan mandated DEI (Diversity, Equity, & Inclusion) efforts on campus.

24.     The email also clarifies that Mr. Griswold's targeting of Mr. Ingram came in part from President Zhou:

> Blake, I need you to prioritize things that are institutional importance, beyond your commitment to the "Human Diversity" initiative. Otherwise, I will limit your travel until I see follow-up and follow through on items.
>
> I look forward to your comments and responses. Consider this my first warning for 2018. I will be following your progression as Lin has been direct with me, and I am responsible for your performance.
>
> Al

COMPLAINT - 5

25.    As later revealed, Mr. Ingram *had* copied Mr. Griswold in a June 2018 email which included Ms. Chapman on the list of conference attendees, and Mr. Griswold *had not* complained at that time. Mr. Ingram also understood he had received Griswold's verbal approval to include Ms. Chapman after an alternate employee became unavailable. During the 2019 investigation (more on that below), Mr. Griswold confirmed that Mr. Ingram had been in the right.

26.    Nevertheless, Mr. Griswold's August 2018 email alleged Mr. Ingram "disregarded his directive" to exclude Ms. Chapman in the professional development opportunity. Despite knowing Mr. Ingram was effectively immobilized on sick leave, the email stated that Mr. Griswold considered this a written warning about Mr. Ingram's "perceived insubordination," suggesting the college was already staging an eventual termination of Mr. Ingram. That targeting continued.

27.    During the July-August time period when Mr. Ingram was on sick leave, numerous emails were exchanged regarding contracting and reporting requirements for the Workforce Central contract (CCW) managed by Brandon Rogers and Mike Brandstetter.

28.    On August 27, 2018 at 2:26 pm, Mr. Rogers announced his intention to *not* follow through with the contract: "Since I won't be involved with it, I don't want us to commit to anything."

29.    On August 27, 2018 at 3:34 pm, Mr. Griswold effectively coerced Mr. Rogers to follow through with the Workforce Central contract regardless of feasibility: "We cannot afford to turn away any possible tuition assistance or partnerships."

30.    Then, on August 29, 2018, Mr. Griswold included Mr. Ingram on a large group invite to a meeting to "meet grant goals while leveraging various resources"

COMPLAINT - 6

31.     At the end of September 2018, emails were exchanged implying that Mr. Ingram was negligent in reporting/invoicing for this newly transferred project.

32.     On September 28, 2018, Mr. Griswold even acknowledged, via email: "I realize you only inherited this employee and the grant;" nevertheless, pre-existing issues with the program were later used as evidence for Mr. Ingram's alleged incompetence.

33.     On September 28, 2018, Mr. Ingram informed Mr. Griswold and Ms. Holly Woodmansee (BTC Finance) that there was no budget for the CCW project in the Budget App. It was only tracking expenditures. Also, this grant and associated personnel were not officially transferred to Mr. Ingram until October 1, 2018. Grant Manager Mike Brandstetter was the supervisor until his retirement on September 30, 2018.

34.     On October 2, 2018, Mr. Ingram communicated to Mr. Griswold that there had been no enrollments to date on the CCW contract, which had been in operation and funded since May 2018, under the previous supervisors. No work had been done to meet the outcomes of that grant, though funded, until Mr. Ingram took over.  Nevertheless, Mr. Ingram was eventually maligned for his failure to report on enrollment which did not exist.

35.     Later in October 2018, during a quick meeting on South Campus Mr. Griswold communicated his expectations that Mr. Ingram should be visible to support staff, and pointed out specifically that Mr. Ingram was being "watched" by staff who reported what they saw to Lin Zhou. Mr. Griswold then asked Mr. Ingram who he thought would be doing the "watching." Mr. Ingram said he thought it would be Lexine Torres watching and reporting, and Mr. Griswold nodded in his confirmation. Mrs. Torres is employed as a High School enrollment advisor in

COMPLAINT - 7

Student Services. It is a position subordinate to Mr. Ingram, and not a part of his chain of command.

36.     On December 13, 2018, Mr. Griswold emailed Mr. Ingram alleging he was delinquent in submitting necessary information to BTC accounting. The email again threatened to be a final warning before future disciplinary action.

37.     That same day, December 13, 2018 at 2:27 pm Mr. Ingram responded via email to Mr. Griswold, providing evidence to correct Mr. Griswold's mis-perception of his delinquency, also questioning his motivation.

38.     On or about December 14, 2018, in an uncanny coincidence, Lexine Torres, a confidante of President Zhou's with a reputation for harassing other staff, began circulating photos of Mr. Ingram sitting in his office. The collection of photos, text messaged and shared amongst colleagues, were intended to shed doubt on Mr. Ingram's professionalism. For example, one un-amused employee recalled how Robin Stanton had sidelined her during a bowling party, scrolling through the Torres photos and laughing because she found it funny that Mr. Ingram was in the same pose at his desk, different times of the day.

39.     Meanwhile, on December 14, 2018, Mr. Ingram presented additional evidence to refute Mr. Griswold's December 13 threatening email, describing instead, how his own November email to Kukharenko had received no reply (hence, she provided no indication she needed more).

40.     On December 16, 2018, Mr. Griswold again emailed Mr. Ingram, continuing with an accusatory tone and advising Mr. Ingram to work *ahead* of deadlines to stay ahead of schedule.

COMPLAINT - 8

41.     On December 20, 2018, Mr. Ingram responded to Mr. Griswold to further dispute the basis for the December 13 email warning and express his concern about Griswold's threat to "permanently impact [Ingram's] employment at Bates" along with his concern about possible conspiracy: "as you have not substantiated the complaint in any way. I am also concerned that Irina [Kukharenko], and maybe you, are on a negative influence campaign with other senior leadership."

42.     In reply, Mr. Griswold emphasized President Zhou's increased emphasis on meeting grant requirements, stating in part: "I have said to you and all the deans that Lin is not Ron, and her expectations are clear. The grants, budgets, and invoices needs managing under your responsibility [sic]..." However, Mr. Griswold also continued, providing what seemed to be a contradiction to earlier messages: **"If I have not put you on a performance plan as of to date, than you should not worry.** I am giving you needed feedback and request you develop strategies to **mitigate allegations."** <u>The email concluded by restating Griswold's longstanding commitment to find Mr. Ingram an administrative assistant to help with said reporting tasks.</u>

43.     Noteworthy, Mr. Griswold, <u>Mr. Ingram's own Supervisor confirmed </u>that Mr. Ingram was <u>not</u> on a performance plan. Nor did Mr. Griswold provide any tangible evidence that Mr. Ingram had, in fact, failed to meet a deadline.  Indeed, Mr. Griswold would not produce any evidence of the complaint/allegation that spurred his latest written warning.

44.     The alternatively negative and then mixed messages from Mr. Griswold, coupled with the rumor of discriminatory photos distributed by President Zhou's known confidant Ms. Torres, became too concerning which, in turn, caused Mr. Ingram to exercise his right to complaint to BTC's HR about the mistreatment he was experiencing.

COMPLAINT - 9

45.     On January 9, 2019—frustrated by six months of mounting harassment despite his good faith efforts to take on a new South Campus Dean role, while upholding institutional ethics *and* recovering from a major spinal injury—Mr. Ingram filed a formal complaint with BTC HR Office.  The Complaint consisted of four parts, implicating several senior administrative leaders:

**Complaint 1:** Hostile Work Environment, Harassment, Disparate Treatment, & Retaliation when EVP Al Griswold initiated formal disciplinary process without cause, merit or fact-based substantiation (i.e. the August 16, 2018, "perceived insubordination" email and the December 13, 2018, email about Ingram's alleged delinquency in reporting).

**Complaint 2:  Disparate Treatment & Impact** when EVP Griswold neglected and failed to provide Mr. Ingram with an administrative assistant to support his sizable Dean responsibilities.  All other Deans have that administrative support. He also cited Griswold's failure to provide a complete and correct  Organization Chart for Mr. Ingram's direct reports. This part of the complaint clarified the pre-existing issues of administrative neglect at South Campus (lax contract oversight, failure to notify staff of grant end periods, overpayment of staff, grant and contract mis-budgeting). These were issues Ingram was being disciplined for that were a) created prior to his arrival in the Dean's role and not his fault and b) never previously resulted in discipline.

**Complaint 3: Nepotism & Cronyism, Conflict of Interest,  Discrimination** again implicating EVP Griswold in unethical hiring practices and possible Title IX violation which Mr. Ingram had become aware of.

**Complaint 4: Academic Fraud and Retaliation Against Employees Who Attempt to Remedy or Report Such Fraud** (i.e. Whistleblower and First Amendment Retaliation) This complaint implicated several managers, senior faculty, and ultimately President Zhou, for aiding and abetting in a decade of misreported and grossly inflated FTE (full time equivalent students) as reported to the SBCTC (State Board for Community & Technical Colleges) entrusted to equitably distribute funds amongst Washington institutions of higher ed. This complaint revealed Mr. Ingram's knowledge of ethical breaches wherein the Early Childhood Education/Child Studies program not only improperly documented enrollment in poorly constructed instructional activities allegedly provided to the cooperative workplace, but also denied tenure and otherwise harassed faculty who advocated for continuous improvement.

46.     This Academic Fraud complaint, which was entirely ignored in the Investigatory Report, should have been quite concerning to the BTC administration given the institution's

COMPLAINT - 10

history    of    sizable    repayments    and    other    consequences    of    documented    FTE

overstatement/enrollment fraud.

47.    Understanding how the above-referenced fraud took place is not intuitive and hence

deserves explanation.  Selected excerpts from the relevant sections of the SBCTC policy manual

https://www.sbctc.edu/colleges-staff/policies-rules/policy-manual/chapter-5.aspx appear below:

### 5.40.60 Enrollment Reporting Discrepancies

Enrollment information is a fundamental element in budget allocations. Therefore, it is necessary that the information reported by community and technical colleges is accurate and consistent. To ensure accuracy and consistency, the following progressive actions may be taken when enrollment reporting does not comply with the RCW, WAC and/or SBCTC policies, procedures, or reporting requirements.

To meet state and federal reporting requirements and to support state policy initiatives, the SBCTC requires that colleges:

A. At a minimum, provide specific class and student data. (see RCW 28B.50.020; Policy Manual 5.10; Required Data Elements)

B. Establish written procedures that are uniformly applied. (see Policy Manual 5.60)

C. Accurately code and report required data and not overstate enrollments. (see Policy Manual 5.40.50)

48.    The SBCTC manual also clarifies detailed accounting expectations for the sorts of

cooperative workplace academic partnerships BTC has with Tacoma area preschools:

### Field-Based Experience

Students are engaged in autonomous study or related work activity under the intermittent supervision of the instructor. This mode includes working with or under the direction of professional practitioners and may include preceptorships, co-ops, internships, or service learning activities. Verification of learning outcomes is documented by college faculty in collaboration with professional practitioners. One credit is generated by a minimum of three weekly contact hours of supervised learning experience. Programs may determine that additional hours are needed for the student learning needs. However, only one credit will be generated for enrollment counting purposes.

COMPLAINT - 11

49.     Kimberly Dunn and Teresa Borchardt (former faculty in the ECE/Child Studies Program, which was formerly known as the Home and Family Life Department) each discussed their concerns with Mr. Ingram prior to his termination.

50.     Ms. Borchardt, an eighteen-year employee of BTC eventually empowered to serve as an instructional design consultant for the college, described the issues within BTC Child Studies Program as follows:

•       Faculty who work within BTC's ECE/Child Studies department can teach traditional credit bearing courses for a two-year degree in Early Childhood Education; however, many of these credit bearing courses are "practicum based" with student learning allegedly taking place during cooperative work experiences in regional child care centers. These practicum-based courses still required a designated number of lecture-based hours to meet accreditation standards.

•       BTC faculty trained in Early Childhood Education also serve/d in less traditional faculty roles providing parent education in BTC Cooperative Preschools and serving as Child Care Advisors to "improve the quality of care and level of professionalism at regional child care centers." To that end, the BTC website describes how, "highly-skilled and educated faculty offer technical training to early childhood education professionals." These community-based faculty positions are funded nearly entirely by FTE reimbursement from the state (as opposed to traditional tuition), thus creating incentive for ECE faculty to "cook the books" to show inflated enrollments and increased contact hours to justify a department budgets to fund full time faculty salaries on FTE reimbursement alone.

•       As early as 2010, Ms. Borchardt noted problems with ethical reporting of enrollment and contact hours in both the ECE Associates Degree program and the Child Studies cooperative arrangements. The above-described manipulation of the numbers sometimes involved artificially inflating FTE numbers (FTE=full time equivalents i.e. the number of students enrolled "full time" insofar as those students are taking 15 credits each quarter; hence two half time students = one full time equivalent).

•       Borchardt also witnessed sometimes ridiculous inflations of credit hours when compared to the actual contact time faculty spent with ECE students.  When it comes to FTE and accreditation, there is an important and sizable difference between "credit hours" and "clock hours."  The situation is complicated because different equations exist for classic "lecture" instruction versus lab practicum

COMPLAINT - 12

instruction; and the formulas for Cooperative Work Experience can be trickier because a faculty member need not be directly present during all hours the student receives work experience credit for. Still, in general, one credit hour *should* require a clearly designated number of "clock" and/or "faculty contact hours" assigned thru BTC's curricular oversight. Students should not be awarded credit if they are not completing the designated contact or clock hours. And all credit bearing courses need to follow state-wide learning outcomes dictated by the Master Course Outline (which also dictates the required clock and faculty contact hours).

• Borchardt became aware that BTC's ECE faculty and staff would sometimes report inflated "credit" hours. This meant students were earning credits, the college was reporting enrollment without the presence of a) the correct number of students or b) instructor involvement to justify the number of credits awarded.

• Eventually Borchardt realized that longstanding ECE faculty were inflating or outright fabricating these credit hours to justify keeping their jobs. When she asked Karen Patjin, a senior ECE faculty administrator who also served as the Faculty Union President, for documentation to support credit hours reported Ms. Patjin yelled at Ms. Borchardt, "I don't have to show you anything." In another instance Patjin told Borchardt that, "We [ECE faculty] don't have to teach more than fifteen minutes; we just then let them [the students] go."

• Borchardt raised this issue with BTC HR, Geoff Kauffman who repeatedly told Borchardt that if she "complained about the ECE" (or words to that effect) she would not get tenure.

• According to Borchardt, these community-based faculty members were also negligent about assuring background checks existed for the students and others interacting with youth in the childcare centers.

• To exacerbate these issues, senior ECE faculty (known on campus as the "coven") served nontraditional faculty roles as "faculty advisors" for regional childcare centers by providing professional development to preschool teachers (separate from more clearly defined duties supporting ECE degree seeking students' coursework). Faculty advisors could also receive overload pay known as "moonlighting" for teaching online ECE classes. This created an incentive for faculty to clock less legitimate hours at their advisory worksites while simultaneously shortchanging the "moonlighting" credits they were supposedly teaching.

• The ECE faculty "coven" were/are a notoriously powerful group within the faculty union at BTC with long histories that pre-date the revolving leadership including President Zhou and President Langrell before her. In general, according

to Borchardt, the faculty union at BTC was sometimes feared by administrators; and this ECE group included both the Faculty Union President and the Faculty Grievance Counselor. In this way certain ECE faculty could/would intimidate the Deans overseeing their professionalism (by threatening to file grievances through the union).

• BTC's President Zhou previously served as the Dean responsible for ECE, and Borchardt and others witnessed specific incidences where Zhou experienced the ECE coven's intimidation/manipulation described above. At one point, the ECE faculty made Ms. Zhou cry. This earlier experience as Dean likely made President Zhou reticent to challenge ECE faculty. *Tellingly, BTC did not investigate the credit fraud described in Mr. Ingram's complaint*.

51.     Finally, Borchardt described her concern surrounding BTC ECE's failure to adhere to SBCTC Policy 5.30.10, by having course outlines on file (as required for BTC Program Review and other curriculum approval processes):

### 5.30.10 State-Funded Classes and Enrollment

In order to be recorded as a state-funded student, the student must be enrolled in a class funded in whole or in part with state funds. *However, not all students in state-funded classes can be recorded as state-funded students.*

Determining whether a class is state-funded:

Classes totally or partially supported by state funds must meet all of the following criteria:

1. The class must be part of a course approved through the college's formal curriculum process. A class syllabus must be on file by the census date of the class.

52.     Policy 5.30.10 is especially important because Mr. Ingram had become familiar with former ECE faculty member Teresa Borchardt due to their mutual involvement in BTC's Program Review process required to address a major NWCCU (Northwest Commission on Colleges and Universities) Accreditation report's recommendation for improvement. During this Program Review process, Borchardt helped to reveal sizable gaps in the ECE's allegiance to the formal curricular standard to include standardized syllabi that reflect master course outlines.

COMPLAINT - 14

- In practice this procedural failure would look like this. An ECE faculty would teach a class on, for example, childhood development strategy. In reality the student should have earned one credit for every ten hours *of contact with the teacher and* that student's credit should have been clearly tied to what is called a "learning outcome" measured by a test, assessment, or other tangible learning artifact. This would assure the students actually learned what the courses were intended to teach. However, the last time Ms. Borchardt checked (March 14, 2019) she could still not locate any such outcome assessment documentation for ECE.

- Bryce Battiste, another instructional designer, also realized there were no Master Course Outlines for the professional development trainings which are fundamental to the ECE's program model.

- NWCCU Accreditation concerns of this sort will sometimes allow for "evidence of continuous improvement" to allow a timeline for compliance; however, to repeatedly silence or remove the very personnel who call for the mandated improvement indicates a systemic problem. And by the timing of Mr. Ingram's complaint, ECE had plenty of time to "catch up" to evolving curricular expectations.

53.     Kimberly Dunn, another ECE Faculty member who eventually filed (on or about August 2019) a whistleblower complaint with the State Auditor's Office (SAO complaint) against the BTC ECE Program, reported similar concerns to Mr. Ingram.

- In addition to clarifying Ms. Borchardt's FTE fraud concerns described above, Ms. Dunn noted Mr. Griswold's initial compliance with the situation: "In November 2017 timeframe I [Professor Dunn] opened the "instructor brief case" and was shocked to see that I was "teaching" 30 students when, in reality, I was only teaching five. **I immediately informed Al Griswold ... .**"

- Ms. Dunn felt very concerned that this form of fraud, dishonestly reporting teacher/student real contact hours, compromises the professionalization of childcare. To that end, she also informed Mr. Ingram of her experiences within ECE, even though he was not her Dean.

- When Dunn reported her concern to Mr. Ingram, he informed her that if she filed the complaint/concern formally to BTC, she should be prepared to lose her job. She remembered this clearly: Mr. Ingram first looked at her then said, "If you make a big complaint you won't have a job anymore."

COMPLAINT - 15

- Nevertheless, Mr. Ingram supported Dunn in making an official complaint. In fact, Ingram said *he* would make the initial formal complaint about the FTE fraud scenario (which he did, in his January 9, 2019 complaint Part 4, which was never investigated by the college.)

- Ms. Dunn also reported her concerns to ECE faculty including Karen Patjens and Joan Rapcock in the early January 2018 timeframe.

- When discussing budget concerns, Joan Rapcock admitted to knowingly giving grades to students she had not instructed. She indicated she knew it was wrong.

- Ms. Dunn also understood that Wendy Newby raised this specific FTE issue with BTC's current president, Lin Zhou, back when Dr. Zhou was the Dean of South Campus.

- After Mr. Ingram was fired, VP Griswold soon found his own head on President Zhou's chopping block; and during that later time period, Dunn recalls a particular meeting when Griswold, himself frustrated by the institution "passing the blame" while ignoring or covering up institutional fraud told Ms. Dunn: "Kimberly you're going to be the one to unravel this situation."

- To that end, in August 2019, Ms. Dunn submitted a state whistleblower complaint to the SAO clarifying her knowledge, along with other ECE concerns, of BTC's ongoing failure to ethically account for the more than 1000 community-based child care and parent education affiliated students who earn up to thirteen Continuing Education Units (CEU) per quarter.

- On March 9, 2020, BTC informed Ms. Dunn that her contract would not be renewed (read: she was fired) effective June 2020. The termination letter cited nefarious claims about Dunn's timeliness, recording of sick leave, and failure to receive proper permission for professional development. Meanwhile, her BTC personnel file was entirely clean/empty, and she had received no documentation to suggest the cited concerns were legitimate performance issues.

- Ms. Dunn believes BTC "non-renewed" (read: fired) her in retaliation for conscientiously reporting the FTE issue to the SBCTC on March 4, 2020; thus affirming a pattern of retaliation against those who would advocate for ethics and transparency within a state funded institution.

54.    Mr. Ingram's efforts to report and support Dunn's and Borchardt's mutual concern about credit fraud happened within the historical context of an institution that previously faced

COMPLAINT - 16

sizable (aka: multi-million dollar) fines and a major budget crisis due to earlier scandals involving

FTE inflation at the BMTC (Business Management Training Center), supervised by Dean Zhou

at that time.

55.     Institutional reports on details of the earlier BMTC scandal are exceptionally well-

guarded; nevertheless, former President Langrell's publicly available Tort Claim letter of 2018

describes the history as follows:

**BACKGROUND FACTS**

> Bates hired Dr. Langrell on the heels of corruption, presidential turnover, and mismanagement scandals because of his reputation as a reformer. Dr. Langrell immediately set to work making dramatic changes to Bates' administrative and financial priorities and to repair the institution's ethical practices. In an unprecedented move, and as a result of years of over-reporting its enrollment, Dr. Langrell rebased Bates' enrollment after uncovering institutional practices of over-reporting its enrollment by nearly 40%, from 5000 FTEs in 2012 to 3000 FTEs in 2018. Dr. Langrell's hard choices also resulted in disgruntled employees who had enjoyed the lax administrations that preceded Dr. Langrell's tenure. For example, Bates was not going to renew Pete Haushka's contract after 2017 – 2018 because it was discovered that he had intentionally overstated enrollment numbers. As stewards of public funds, Dr. Langrell was committed to ensuring integrity and accountability for all Bates employees and the college. Under Dr. Langrell's leadership, Bates flourished, won awards, and gained a reputation as a high-performing organization.

56.     Although the narrative presenting Langrell as a "reformer" is dubious, the

institutional practice of "over-reporting enrollment" during the 2012-2018 time period is

presumably accurate. And lest it get lost in the fine print, former President Langrell confirmed to

his own lawyer that he'd uncovered **"institutional practices of over-reporting its enrollment**

**by nearly 40%, from 5000 FTEs in 2012 to 3000 FTEs in 2018."**  This was a major concern

well known on BTC campuses and to a lesser extent throughout the statewide

community/technical college system and SBCTC.

57.     Mr. Ingram's complaint/concern about ongoing academic fraud was further

supported by his knowledge of lawsuits against BTC instigated by former BTC students who felt

their education was short-changed by the institution's failure to enforce basic academic

COMPLAINT - 17

accountability. For example, in 2008, BTC paid $500,000 settlement to students of a civil engineering degree program who complained, in part, that their lead instructor frequently failed to show up to teach class.  Earlier, BTC paid $1.25 million to former students of the denturist program     and     $170,000     to     students     in     its     court-reporting     program. https://www.heraldnet.com/news/tacoma-college-pays-500000-to-settle-students-lawsuit/

58.     Mr. Ingram was aware of which programs, including ECE, still struggled with academic integrity due to his active role in the academic Program Review processes required by BTC's earlier accreditation recommendations.

59.     Despite the sizable evidence to support the sincerity of his concern, BTC's investigative report into Mr. Ingram's January 2019 complaint *failed to investigate anything related to Complaint 4:* Academic Fraud and Whistleblower Retaliation, clearly suggesting the institution's complacency/corroboration vise-vi the concerns. Other complaints of a suspected Title IX violation and harassing photos were also overlooked by the college and its investigator.

60.     Instead, BTC chose to move forward with an exceptionally rapid non-renewal/termination which included nil in the way of progressive discipline for Mr. Ingram, a 20-year campus leader.

61.     The timeline of Ingram's final months is summarized below.

62.     On April 9, 2019 Ingram met Patrick Pearce (BTC's outside investigator) regarding his full list of complaints submitted January 9, 2019. Mr. Pearce informed Ingram he would only be investigating the first two complaints. At that meeting Mr. Pearce handed Mr. Ingram BTC's Policy on Discrimination & Harassment, dated August 2018. As a leader on the College Council,

COMPLAINT - 18

Mr. Ingram is aware that no such policy was approved by the College Council or the Board of Trustees in 2018.

63.    On April 11, 2019, Mr. Ingram emailed HR Christina Nelson additional concerns he was having with Mr. Griswold and requested additional time to meet with the investigator, as they had only completed discussion of the first complaint.

64.    On April 11, 2019, Mr. Ingram also received a written witness statement from Jannica Scott confirming what had become a derogatory photographic meme shown by Robin Stanton and created and distributed by Lexine Torres.

65.    April 12, 2019, Mr. Ingram emailed Ms. Nelson and Mr. Pearce the witness statement and provided historical context for the harassment to implicate President Zhou's involvement.

66.    On April 22, 2019, Mr. Ingram had a second interview with Investigator Pearce.

67.    On May 9, 2019, Mr. Ingram emailed Ms. Nelson asking about changes to his organizational chart which had reduced his areas of responsibility effective April 8, 2019. Ms. Nelson responded with an illogical, ineffective answer by email which Mr. Ingram forwarded to Mr. Pearce.

68.    On May 30, 2019 Ms. Nelson emailed Mr. Ingram, the final investigators report, stating that Mr. Pearce was no longer working with the contracted law firm and apologized for the delay in delivering the report. As it turned out, Ms. Nelson had received the report May 14, 2019.

COMPLAINT - 19

69.     On or about May 30, 2019, Mr. Ingram informed Ms. Nelson of factual inaccuracies in the report and expressed his concern that Mr. Pearce had failed to interview Mr. Ingram's requested witnesses.

70.     On June 13, 2019, Ms. Nelson delivered Mr. Ingram a notice of non-renewal in a brief meeting at South Campus. Mr. Ingram was instructed to shut down his computer and told to continue on work-from-home status until his termination effective June 30, 2019.

71.     On June 15, 2019, Mr. Ingram attempted to log on to his work system from home and was locked out.

72.     Further motivation to retaliate against and unlawfully terminate Mr. Ingram relates to Ingram's role in the 2018 investigation of former President Ron Langrell, who was tightly aligned with President Zhou and helped her secure her position as interim and eventually permanent President.

73.     During the course of the Title IX investigation which contributed to President Langrell's termination, Mr. Ingram met with a *The Tacoma News Tribune* reporter regarding Mr. Langrell's and others abuses of power, dishonesty, and extreme unprofessional behaviors. Indeed, at times Mr. Griswold witnessed Mr. Langrell pressuring Mr. Ingram to act unethically, but would sit silently. And in January 2017, Mr. Griswold told Mr. Ingram words to the effect that "[a]s a black man, Ingram could not manage these people [white faculty]."

74.     Furthermore, Zhou had motive to fire Mr. Ingram (who opposed workplace race/gender/national origin discrimination by implementing diversity and equity policies and practices) because Zhou resented employees who encouraged the institution to pursue diversity initiatives.

COMPLAINT - 20

75.     It was no secret in BTC circles that President Zhou lacked cultural sensitivity. It is anticipated that Ms. Borchardt will testify to knowledge of Zhou, upon introducing a new Vice President of Instruction, announcing to that person's new direct reports, "He's a gay!" Zhou has also been known to make fat jokes and mock other employees, as well as her own accent when commanding the microphone at large in-service gatherings.

76.     Ms. Borchardt also reported how DEI Council members, Laurie Arnold and Sheila Lee had done an IDI (Intercultural Development Inventory) inclusivity assessment of campus leadership. The administrators, including Ms. Zhou, scored very poorly, reflecting they were exceptionally "unaware of their own bias" that the administration asked that the Inventory not be reported back. And as noted earlier, Mr. Ingram was not the only member of the Diversity Council to find themselves without a job.

77.     As witness Kimberly Dunn will likely testify, EVP Mr. Griswold, prior to his demotion and removal, may have sometimes had good intentions but "received pressure from President Zhou to turn a blind eye to the ethics of FTE fraud." Dunn believed, "Mr. Griswold was 'caught in between' the President, the Finance VP, and the faculty union leadership who were in collusion with the ECE FTE doctoring."

### III. CAUSES OF ACTION

78.     Plaintiff incorporates the above paragraphs as if pled verbatim herein.

       **(Count One – Wrongful Discharge in Violation of Public Policy)**

79.     Plaintiff incorporates the above paragraphs.

COMPLAINT - 21

80.    "An    employee    discharged    for whistleblowing has    a    statutory    claim for wrongful discharge." *Young v. Ferrellgas, L.P.*, 106 Wn.App. 524, 528 (2001)(*citing Gardner v. Loomis Armored, Inc.* 128 Wn.2d 931, 937 (1996)).

81.    The fraud and nepotism complaints contained in Mr. Ingram's January 9, 2019, complaint constitute whistleblowing.

82.    Mr. Ingram's whistleblowing was a substantial factor in BTC's decision to terminate him given the closeness in time between BTC's closing of its investigation of the January 9, 2019, complaint and termination, BTC's history of adversely treating other workers (Borchardt/Dunn) who complained about the fraud-like credit misreporting specified in count four of Mr. Ingram's complaint, and BTC's failure to investigate the nepotism and fraud allegations contained in the complaint.

83.    BTC's termination of Mr. Ingram's employment caused him damages in an amount to be proven at trial.

**(Count Two – Violation of Washington Law Against Discrimination (WLAD) – Retaliation - RCW 49.60.210)**

84.    Plaintiff incorporates the above paragraphs.

85.    The WLAD makes it illegal for an employer to discharge an employee who opposes practices forbidden under the WLAD.

86.    Practices    forbidden    under    the    WLAD    include    race    discrimination,    gender discrimination, and sexual harassment.

87.    Mr. Ingram opposed practices forbidden under the WLAD by (a) participating in the sexual harassment reporting of BTC's former president Langrell, (b) filing his own discrimination

COMPLAINT - 22

claim against BTC on January 9, 2019, and (c) promoting workplace diversity and inclusion efforts.

88.    Mr. Ingram's opposition to practices forbidden under the WLAD was a substantial factor in BTC's decision to terminate him given the closeness in time between BTC's closing of its investigation of the January 9, 2019, complaint and termination, the inaccurate/factually incorrect reasons BTC used in justifying Mr. Ingram's alleged poor performance, and BTC's failure to investigate Mr. Ingram's allegation that Zhou's friend was surreptitiously taking photos of him and circulating those photos.

89.    BTC's termination of Mr. Ingram's employment caused him damages in an amount to be proven at trial

**(Count Three – Violation of the First Amendment of the U.S. Constitution – Retaliation)**

90.    A First Amendment retaliation claim requires proof that: "(1) the plaintiff spoke on a matter of public concern; (2) the plaintiff spoke as a private citizen or public employee; (3) the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) the state had an adequate justification for treating the employee differently from other members of the general public; and (5) the state would have taken the adverse employment action even absent the protected speech." *City of San Diego v. Rose*, 543 U.S. 77, 80 (2004); *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011).

91.    Regarding point (1), misuse of public funds, wastefulness, and inefficiency in managing and operating governmental entities are matters of public concern for purposes of First Amendment retaliation. *Keyser v. Sacramento City of Unified School Dist.*, 265 F.3d 741, 747 (9th Cir. 2001) (quoting *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1405 (9th Cir. 1988)). Mr. Ingram complained about fraud relating to BTC's ECE (formerly Home and Family Life Dept.), nepotism,

COMPLAINT - 23

and other related matters as set out in counts 3 and 4 of his January 9, 2019, complaint.

92.     Regarding point (2), "the determination whether the speech in question was spoken as a public employee or a private citizen presents a mixed question of fact and law." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008) (*citing Garcetti*). Factors germane to whether a worker spoke pursuant to her job duties or as a public citizen include:

> 92.1.   (a) Whether the worker directed his speech inside or outside the regular chain of command as keeping the issue within the chain of command is more consistent with speaking pursuant to job duties. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074-1075 (9th Cir. 2013).
>
> 92.2.   (b) Whether the speech was made pursuant to a normal departmental procedure/routine report as doing so is consistent with speaking pursuant to job duties; however, "if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another such watchdog unit." *Dahlia*, 735 F.3d at 1075.
>
> 92.3.   (c) Whether the employee spoke in direct contravention to his or her supervisor's orders for "when a public employee speaks in direct contravention to his supervisor's orders that speech may often fall outside of the speaker's professional duties." *Id.* at 1075-1076.

93.     Mr. Ingram directed his objection to the above-referenced matters of public concern to BTC's HR department, i.e. outside his chain of command. Mr. Ingram's reporting/speech regarding those matters of public concern did not fall within his job duties.

94.     Regarding points (3), (4), & (5), was a substantial factor in BTC's decision to terminate him given the closeness in time between BTC's closing of its investigation of the January 9, 2019, complaint and termination, BTC's history of adversely treating other workers (Borchardt/Dunn) who complained about the fraud-like credit misreporting specified in count

COMPLAINT - 24

four of Mr. Ingram's complaint, and BTC's failure to investigate the nepotism and fraud allegations contained in the complaint.

95.   Bates' actions caused Mr. Ingram damages in an amount to be proven at trial.

**(Count Four – Violation of Washington's Public Record Act)**

96.   Washington's Public Record Act requires government agencies, like BTC, to produce records in response to record requests made by members of the public.

97.   On January 8, 2020, Mr. Ingram submitted a public record request to BTC.

98.   That public record request sought, among other things, "Each photo of Mr. Ingram that Lexine Torres took, sent to or received from any employee of BTC during 2018 – 2019."

99.   As of the date of this complaint BTC has yet to produce the photographs requested by Mr. Ingram.

100.   BTC has no legal justification to withhold those photos/memes.

101.   BTC's wrongful withholding of the photos/memes has caused Mr. Ingram damages allowed under the Public Record Act.

**IV. PRAYER FOR RELIEF**

Plaintiff respectfully seeks:

A.   All damages allowed under the law including front pay, back pay, liquidated damages, pre-judgment interest, adverse tax consequences, general damages including, without limitation, emotional distress damages, and punitive damages.

B.   Attorneys' fees, costs, and litigation expenses.

C.   All damages allowed under the Public Record Act.

COMPLAINT - 25

D. A declaration that Defendant violated Washington Law as it relates to wrongfully discharging Mr. Ingram, the WLAD, and the First Amendment.

E. All other relief that is just and equitable.

DATED this July 31, 2020.

CROTTY & SON LAW FIRM, PLLC

By: _____

Matthew Z. Crotty, WSBA No. 39284

Attorneys for Plaintiff

COMPLAINT - 26